UNITED STATES, Appellee,

v.

**Staff Sergeant Armand A. ANDREOZZI,
United States Army, Appellant.**

ARMY 9800870.

U.S. Army Court of Criminal Appeals.

4 Nov. 2004.

For Appellant: David P. Sheldon; Mary Price; Eugene R. Fidell; Captain Josh Braunstein, JA (on brief); David P. Sheldon; Eugene R. Fidell; Captain John N. Maher, JA (on reply brief); David P. Sheldon; Steven H. Wishod; Captain Runo Richardson, JA (on brief after 1st *DuBay* session); David P. Sheldon; Karen L. Hecker; Captain Charles A. Kuhfahl, Jr., JA (on brief after 2nd *DuBay* session); Colonel Robert D. Teetsel, JA; Lieutenant Colonel Mark Tellitocci, JA; Major Sean S. Park, JA; Captain Charles A. Kuhfahl, Jr., JA (on reply brief after 2nd *DuBay* session); Captain Mary C. Vergona, JA.

For Appellee: Colonel David L. Hayden, JA; Lieutenant Colonel Edith M. Rob, JA; Major Mary E. Braisted, JA (on brief); Colonel Steven T. Salata, JA; Lieutenant Colonel Paul H. Turney, JA; Major Paul T. Cygna-

rowicz, JA; Captain Tami L. Dillahunt, JA (on brief after 1st *DuBay* session); Major Theresa A. Gallagher, JA; Major Natalie A. Kolb, JA; Captain Janine P. Felsman, JA (on brief after 2nd *DuBay* session); Lieutenant Colonel Margaret B. Baines, JA.

Before CAREY, Chief Judge, BARTO, and SCHENCK, Appellate Military Judges.

## OPINION OF THE COURT

CAREY, Chief Judge.

A general court-martial composed of officer and enlisted members convicted appellant, contrary to his pleas,[1] of rape, forcible sodomy, assault consummated by battery, burglary, kidnapping, and solicitation of another to assist in escape from pretrial confinement (two specifications), in violation of Articles 120, 125, 128, 129, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 920, 925, 928, 929, and 934 [hereinafter UCMJ]. The court members sentenced appellant to a dishonorable discharge, confinement for twenty-seven years, forfeiture of all pay and allowances, and reduction to Private E1. The convening authority approved the adjudged sentence except forfeiture of all pay and allowances, waived automatic forfeitures for six months and directed payment of such monies to appellant's spouse pursuant to Article 58b(b), UCMJ, 10 U.S.C. § 858b(b), and credited appellant with 153 days of confinement for pretrial confinement served.

## I. INTRODUCTION

Appellant was estranged from his wife, Mrs. Andreozzi, when he entered her residence with a garage door opener and a key he had retained after moving out. Appellant waited until she arrived home from work, and then using his 9 mm pistol threatened to kill her. Appellant forced her to engage in sodomy and sexual intercourse with him. When the police arrived at her residence, appellant fled, taking his pistol with him. Appellant subsequently showed the police where he discarded his pistol.

---

1. Pleas were not entered on the record. This irregularity does not amount to prejudicial error. *See United States v. Lanier*, 50 M.J. 772, 773–74 n. 2 (Army Ct.Crim.App.1999), *aff'd*, 53 M.J. 220 (C.A.A.F.2000).

Based on appellant's statements to police, trial defense counsel argued a consent defense to the sexual offenses. Appellant claimed that Mrs. Andreozzi consented to the sexual activity because appellant said he would kill himself with the pistol if she did not allow him to engage in sexual activity with her.

In this Article 66, UCMJ, 10 U.S.C. § 866, appeal, appellate defense counsel assert seven assignments of error. Three assignments of error merit discussion, but no relief. Appellant's assertions under *United States v.*

2. As one of several requests for *Grostefon* relief, appellant seeks redress because he was in maximum custody from 2 November 1998 through 14 January 2000 for a total period of 439 days, and in October and November of 2000 for an additional 29 days. Appellant was found guilty at a second general court-martial of desertion from on or about 15 June 1998 until his apprehension on or about 8 July 1998, escape from post-trial confinement, larceny, wrongful appropriation of a vehicle, assault upon a law enforcement officer in the performance of his duties (two specifications), aggravated assault upon a military law enforcement officer, kidnapping, and carrying a concealed weapon in violation of Articles 85, 95, 121, 128, and 134, UCMJ, 10 U.S.C. §§ 885, 895, 921, 928, and 934. On 13 November 1998, appellant was sentenced to confinement for fifteen years and a dishonorable discharge. *United States v. Andreozzi*, ARMY 9801612 (Army Ct. Crim.App. 19 Oct. 2001) (unpub.).

In order to receive a remedy, appellant must establish that the severity of the approved sentence was unlawfully increased by prison officials, and that the sentence was executed in a manner inconsistent with Article 55, UCMJ, 10 U.S.C. § 855, and the Constitution. *United States v. White*, 54 M.J. 469, 472 (C.A.A.F.2001). Appellant must establish "a 'clear record' of both 'the legal deficiency in administration of the prison and the jurisdictional basis for action.' " *Id.* (quoting *United States v. Miller*, 46 M.J. 248, 250 (C.A.A.F.1997)). After careful consideration of the materials appellant submitted, we conclude that appellant has not established a "clear record" that prison officials violated Article 55, UCMJ, or the Eighth Amendment. *See United States v. Avila*, 53 M.J. 99, 100–01 (C.A.A.F.2000) (finding that 421 continuous days in maximum custody, during both pretrial and post-trial, did not amount to "cruel and unusual punishment").

3. *United States v. DuBay*, 17 U.S.C.M.A. 147, 37 C.M.R. 411, 1967 WL 4276 (1967).

4. At the initial *DuBay* session, appellant testified that he did not request trial by enlisted members, and his two counsel testified that they did not remember making any such request. No written request for enlisted members was presented at

*Grostefon*, 12 M.J. 431 (C.M.A.1982) are also without merit.[2]

First, the military judge erred by failing to ensure appellant personally selected his trial forum on the record. We ordered a *DuBay* [3] hearing to gather evidence regarding whether appellant personally selected a court composed of at least one-third enlisted members. The first *DuBay* session did not adequately address this issue.[4] We ordered additional *DuBay* fact finding,[5] which established that there was substantial compliance with Article 25(c)(1), UCMJ, 10 U.S.C. § 825(c)(1).[6]

the first *DuBay* session. The military judge who conducted the first *DuBay* session found that the evidence did not establish "that the appellant made a personal decision to be tried by a court-martial with enlisted members." There was no averment or any evidence presented at the first *DuBay* session that the trial counsel, military judge, or other government personnel (who might have been responsible for processing a trial forum request) were interviewed or that their files or computers were inspected for relevant evidence. We concluded that the initial *DuBay* session was not sufficiently thorough to resolve the trial forum issue and remanded the case for additional fact finding.

5. We respectfully disagree with our dissenting brother, who now regrets joining in our order of a second *DuBay* session despite the clear inadequacy of the first session. While counsel have primary responsibility to develop evidence at trial, *United States v. Hill*, 45 M.J. 245, 249 (C.A.A.F.1996), a military judge conducting a *DuBay* hearing has an affirmative responsibility to ensure impartial, thorough, timely, and well-documented inquiry into the matter at issue. *Cf. United States v. Acosta*, 49 M.J. 14, 18 (C.A.A.F. 1998) (stating, " 'while a military judge must maintain impartiality, the judge can and must ask questions in order to clear up uncertainties in the evidence or to develop the facts further' " (citation omitted)). The military judge should issue necessary orders and ask appropriate questions to ensure accomplishment of this affirmative responsibility. *See id.* In some *DuBay* hearings, a military judge serves as the functional equivalent of a special master. *United States Navy–Marine Corps. Court of Military Review v. Carlucci*, 26 M.J. 328, 340 (C.M.A.1988). Special masters have full authority to resolve the presented issue. *Id.* at 341. They are authorized to conduct investigations, call witnesses, take necessary evidence, and must make a full report with recommendations as to disposition of the issue. *Id.*

6. During the discovery process for the second *DuBay* session, the parties located two typed

Second, the military judge did not abuse his discretion by refusing to permit cross-examination of Mrs. Andreozzi about her prior sexual conduct with appellant to show her consent to the charged sexual activity. Even if the military judge did abuse his discretion, any error was harmless beyond a reasonable doubt.

Third, the military judge erred when he instructed the members to disregard a defense witness' descriptions of appellant's hearsay statements because the witness (appellant) could not be cross-examined on those statements. This instruction improperly highlighted the accused's failure to testify. The strong government case together with the military judge's subsequent curative instruction, however, rendered this error harmless beyond a reasonable doubt.

## II. TRIAL FORUM ELECTION

### A. Evidence

At an Article 39(a), UCMJ, pretrial hearing on 29 April 1998, the military judge properly advised appellant of his forum rights, including his right to a trial with at least one-third enlisted members. Appellant indicated that he understood his trial forum options. Appellant's civilian defense counsel, Mr. Michael Duncan,[7] and CPT Rommel[8] were present at the hearing. Mr. Duncan chose to defer forum selection, assuring the military judge that forum selection would be made in "approximately 2 weeks." After the military judge announced that notice of pleas and forum selection were due on 5 June 1998, he completed appellant's arraignment.

Appellant's civilian counsel was aware, prior to the members being seated for the first time, that enlisted members were detailed to

appellant's trial.[9] At the 10 June 1998, Article 39(a), UCMJ, session, the members were called and trial counsel announced that the court was convened by the original Court–Martial Convening Order (CMCO), as amended on 9 June 1998. The amended CMCO viced some officer and enlisted members and detailed others for appellant's trial only. The court members' names and ranks were then announced. The panel members were wearing military uniforms and their ranks were visible. Mr. Duncan conducted voir dire of the members, including individual voir dire of some enlisted members. After consulting his client, Mr. Duncan did not challenge any members, officer or enlisted. Over the next three days, trial was conducted without any discussion of forum selection on the record. After trial, the defense submitted matters under Rule for Courts–Martial [hereinafter R.C.M.] 1105; they noted some alleged legal errors, but did not object to trial forum or allege a violation of Article 25, UCMJ.

Appellant was actively involved in his trial. For example, at arraignment, when the military judge explained to appellant that if he was absent at a subsequent session he would "give up substantial [C]onstitutional rights," appellant responded, "what [C]onstitutional rights would those be, sir?" The trial judge testified at the second *DuBay* session that he had never had an accused ask which Constitutional rights are jeopardized by a post-arraignment absence. The trial judge also observed that appellant was very active in his own defense, frequently consulting with his counsel during trial. The military judge at the second *DuBay* session found that "based on my own observations during the hearing,

requests for enlisted members, each signed by appellant's detailed military trial defense counsel, Captain (CPT) Sean F. Rommel. After additional testimony, the military judge at the second *DuBay* session concluded that appellant had personally requested trial by a court including one-third enlisted members and that appellant had communicated his election to CPT Rommel.

7. Prior to appellant's trial, Mr. Duncan served three years on active duty as a trial defense counsel and had ten years experience as a civilian defense counsel, including occasional representation of military accused at courts-martial.

8. Captain Rommel tried approximately ten trials with members as a trial defense counsel before representing appellant; he was no longer on active duty at the time of the first *DuBay* session.

9. Shortly before the members were seated for the first time, Mr. Duncan advised the military judge that he had seen the seating chart for the members, which identified enlisted service members. The record also indicates that Mr. Duncan had possession of the Sergeant Major's biography sheet.

the appellant is very intelligent, articulate, and takes a very overt role in his case."

### Captain Rommel's Testimony

During the *DuBay* sessions, CPT Rommel said he probably discussed trial forum options with appellant because it was his normal practice to do so. He could not, however, specifically remember having such a discussion with appellant. Captain Rommel could not recall appellant ever making a particular forum selection or requesting enlisted panel members. Captain Rommel agreed it was "possible" that appellant said he wanted a panel including enlisted members.

Captain Rommel's preferred a panel including enlisted members. He explained why he would have advised appellant to request an enlisted panel:

> First of all I would never have taken a case involving alleged sexual conduct with evidence of violence to Judge Hough alone. This is something I just wouldn't have done. I wouldn't have advised a client to do that. Also Sergeant Andreozzi had a very stellar background. He was a perfect candidate for a good soldier defense, and in my view an enlisted panel would have been more receptive to that.

Captain Rommel testified at the second *DuBay* session that he signed a document entitled, "NOTICE OF PLEAS AND FORUM," which was dated 22 May 1998.[10] It was CPT Rommel's usual practice to personally deliver documents to the military judge's office (which was located upstairs from CPT Rommel's office) by dropping them into the box located outside the judge's office. Captain Rommel found in his case file, and provided for the second *DuBay* session, a second "NOTICE OF PLEAS AND FORUM." Both notices were the same, except there was a slight variation in CPT Rommel's original signature. Both notices included the statement, "SSG Armond [sic] Andreozzi requests to be tried by a panel consisting of at least one third enlisted soldiers."

Captain Rommel testified at the *DuBay* sessions that: (1) forum was the client's decision which he would have honored; (2) he would not execute an enlisted panel request without first ensuring his client's decision regarding the same; and (3) he would not have signed a forum request without reading it first. Captain Rommel insisted that he would not have turned in the request for enlisted members and then asked appellant for validation after the fact. He stated, "I would not have done that for any case, for any client. Now I don't specifically recall in this particular issue, but I can tell you that would have been something that I just wouldn't have done." Although CPT Rommel did not specifically recall creating, showing to appellant, or delivering to the military judge's office the request for enlisted members, CPT Rommel was emphatic that he would not have requested an enlisted panel contrary to appellant's desires. Captain Rommel also said that if appellant had stated after 22 May 1998 that he wanted a different forum, he would have taken action to implement appellant's request.

During voir dire and challenges, appellant sat between CPT Rommel and Mr. Duncan and was included in discussions regarding challenges. Neither defense counsel nor appellant objected to the enlisted panel.

### Mr. Duncan's Testimony

During the *DuBay* sessions, Mr. Duncan testified that he had discussed trial forum options with appellant more than once. An enlisted panel was probably the "most common [forum] choice" of Mr. Duncan's clients. Mr. Duncan probably advised appellant to choose a panel including enlisted members. Mr. Duncan did not remember: (1) receiving appellant's response to his forum advice; (2) making a forum selection on appellant's behalf; or (3) discussing forum selection with trial counsel. Mr. Duncan was not "surprised" to see a panel walk into the courtroom on the day of the trial. Mr. Duncan did not specifically recall discussing panel members or their questionnaires with appellant. Mr. Duncan testified that typically he

---

**10.** Judge Hough provided this document for the second *DuBay* session. Judge Hough testified

that he found this document in his files.

would ask an accused whether he had any concerns about any particular panel member with a view toward either establishing a challenge for cause on the panel member or perhaps using a peremptory on that member. At the time of appellant's trial, it did not occur to Mr. Duncan that forum selection had not been entered on the record.

### Appellant's Testimony

At the time of trial, appellant was a thirty-seven-year-old staff sergeant with nearly nine years in the Army. He had a General Technical score of 111 and military occupational specialty of helicopter repair. Appellant was a high school graduate with two years of college.

At the *DuBay* hearing, appellant testified that he understood that there were three forum options and he knew what each option was. Appellant had discussed these options with his counsel, but he did not know that forum choice was his decision alone. After the members were seated and throughout his trial, appellant did not realize or notice that there were enlisted members on his panel. He denied asking his counsel to request trial by enlisted members, and denied seeing CPT Rommel's written request for enlisted members prior to completion of his trial.

### B. Discussion

Appellate defense counsel speculate that: (1) CPT Rommel may have signed the request for enlisted members without discussing it with appellant; (2) the request for enlisted members may have been inadvertently mixed in with some other motions and accidentally been given to the military judge; and (3) appellant's counsel at trial were so consumed with trial preparation that they "took no notice of the court composition"

when the enlisted members entered the courtroom. We disagree.

Military appellate courts review a military judge's findings of fact under a clearly erroneous standard and review a military judge's conclusions of law de novo. *See generally United States v. Ayers*, 54 M.J. 85, 95 (C.A.A.F.2000). In this case, we accept and adopt as our own the findings of fact from the second *DuBay* session. The military judge at the second *DuBay* session had more evidence upon which to base her decision and her findings of fact are firmly supported by the evidence.

We have briefly summarized the facts in this opinion and articulate our own conclusions based on the totality of the circumstances.[11] As such, we conclude the following: At trial, the military judge and appellant's counsel discussed the merits of trial forum options with appellant. Appellant understood his forum options and that forum choice was his decision to make personally. Thereafter, appellant told his counsel he desired a forum that included enlisted members. Appellant's counsel conveyed this information to the Office of the Staff Judge Advocate (OSJA), which took action to issue a new court-martial convening order to ensure implementation of appellant's requested forum at trial.[12] Captain Rommel prepared and signed a written request for enlisted members and delivered it to the military judge. Appellant was present in court and was fully aware that his panel included enlisted members when the members were announced and seated, when Mr. Duncan conducted individual voir dire of some enlisted members, when defense counsel discussed with appellant who should be challenged, and when Mr. Duncan stated that

---

11. *See* UCMJ art. 66(c) ("In considering the record, the [Court of Criminal Appeals] may weigh the evidence, judge the credibility of witnesses, and determine controverted questions of fact, recognizing that the trial court saw and heard the witnesses."); *United States v. Morris*, 44 M.J. 841, 843 (Army Ct.Crim.App.1996), *aff'd*, 49 M.J. 227 (C.A.A.F.1998). Our conclusions result in part from "[i]nferences and presumptions[, which] are a staple of our adversary system of factfinding. It is often necessary for the trier of fact to determine the existence of [a] ... fact— from the existence of one or more evidentiary or

basic facts." *United States v. Benedict*, 55 M.J. 451, 454 (C.A.A.F.2001) (third alteration in original) (internal quotation marks omitted) (quoting *County Court of Ulster, New York v. Allen*, 442 U.S. 140, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979)).

12. In a search pursuant to this court's order, no written request(s) for enlisted members were found in the OSJA files. No OSJA witnesses testified about receiving any requests for enlisted members.

he did not wish to challenge any members, officer or enlisted. Although appellant did not personally articulate his request for enlisted members orally on the record, appellant did, in fact, personally elect to be tried by an enlisted panel. Appellant has not alleged, and we do not find, that appellant was coerced into selecting enlisted members or that he lacked the ability to knowingly, intelligently, and voluntarily make forum election.[13]

■ Article 25(c)(1), UCMJ, authorizes enlisted members "only if . . . before the court is assembled for the trial of the accused, the accused personally has requested orally on the record or in writing that enlisted members serve on it." *See* R.C.M. 903(b)(1). In our de novo review, we conclude that the military judge erred by not obtaining from appellant, on the record, a personally-articulated oral request for enlisted members or a written request for enlisted members signed by appellant. The military judge was not alone, however, in his error by omission. Appellant's trial defense counsel erred by failing to state on the record that appellant desired a court including enlisted members,[14] and trial counsel erred by failing to call this omission to the military judge's attention.

■ Failure to obtain appellant's forum request on the record, however, was not jurisdictional because the *DuBay* hearing established that appellant requested an enlisted forum through counsel.[15] *See United States v. Morgan*, 57 M.J. 119, 122 (C.A.A.F. 2002) ("The failure to get appellant's request on the record was a procedural error, not a jurisdictional defect."); *United States v. Townes*, 52 M.J. 275, 277 (C.A.A.F.2000) (stating that failure to obtain accused's personal request on the record was nonjurisdictional error "because there [was] sufficient indication by [the accused] orally and on the

record that he personally requested enlisted members"); *United States v. Turner*, 47 M.J. 348, 350 (C.A.A.F.1997) (holding that counsel's forum election on the record on appellant's behalf in lieu of appellant's personal in-court election was not jurisdictional error); *United States v. Mayfield*, 45 M.J. 176, 177–78 (C.A.A.F.1996) (holding that absence of a forum election on the record did not require reversal because appellant submitted " 'pretrial paper-work' " for trial by military judge alone and expressed same desire in a post-trial Article 39(a), UCMJ, session); *United States v. Daniels*, 50 M.J. 864, 867 (Army Ct.Crim.App.1999). "We believe that the logical and compelling conclusion flowing from *Turner* [and other cases cited herein] is that failures to comply with the strict terms of Article 16 [or 25], UCMJ, are no longer considered errors of jurisdictional moment. Instead, they represent procedural non-compliance with statutory provisions, and must be tested for prejudice." *Lanier*, 50 M.J. at 780.

We are satisfied that although appellant neither signed the written request for enlisted members nor personally articulated his request orally on the record, appellant did, in fact, personally elect to be tried by an enlisted panel. As our superior court decided in *Townes*, 52 M.J. at 277, we hold that because there was substantial compliance with Article 25, UCMJ, the failure to comply with the procedural requirements of Article 25, UCMJ, did not materially prejudice appellant's substantial rights.

### III. MILITARY RULE OF EVIDENCE 412

#### A. Introduction

Mrs. Andreozzi was the alleged victim and the only testifying eyewitness to appellant's

---

13. A pretrial sanity board determined appellant was competent to stand trial.

14. It would be ineffective assistance of counsel for trial defense counsel not to ask appellant for his forum decision, to fail to convey appellant's forum decision to the government for implementation, or to fail to object to a court including enlisted members in contravention of appellant's wishes. *See Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

Appellant has not established that his counsel were ineffective in this regard.

15. Appellant suggests that we apply the strict standard articulated in *United States v. Hood*, 37 M.J. 784 (A.C.M.R.1993), where our court found a "jurisdictional defect" in the failure to request, on the record, a trial forum that included enlisted members. To the extent that *Hood* conflicts with this decision, we overrule *Hood*.

charged offenses of burglary, kidnapping, assault consummated by battery, forcible sodomy, and rape, all occurring on 20 January 1998. After Mrs. Andreozzi's direct testimony was completed, appellant's defense counsel raised a previously deferred motion to cross-examine Mrs. Andreozzi about two prior instances of consensual sexual activity, involving masturbation, sodomy, and sexual intercourse, with appellant in November 1997. The defense proffered that the most recent instance occurred two days after Thanksgiving, after the couple had filed for divorce and started sleeping in separate bedrooms. The sexual activity in November 1997 and on 20 January 1998 took place at Mrs. Andreozzi's residence.[16]

The defense argued that the sexual activity in November 1997 went to the issue of consent on 20 January 1998. The defense contended that Mrs. Andreozzi's descriptions of her own masturbation, sodomy, and sexual intercourse at appellant's direction on 20 January 1998 were similar to the sexual acts in November 1997. Trial defense counsel stated in regard to the two November occasions that "it wasn't unusual for [appellant] to make specific requests of Mrs. Andreozzi." Trial counsel said that he did not agree with the defense description of the activity in November 1997, but he did not specifically explain how the defense proffer about the sexual activity in November 1997 was incorrect. Mrs. Andreozzi did not testify about the November 1997 sexual activity.

The military judge agreed with trial counsel that the circumstances in November 1997 and on 20 January 1998 were different. He concluded that the November sexual activity was not relevant and had "very very low" probative value to the issue of consent. The military judge listed four factors that showed Mrs. Andreozzi's lack of consent to sexual activity on 20 January 1998:(1) Mrs. Andreozzi's decision to change the locks; (2) Mrs. Andreozzi's sole ownership of her residence; (3) appellant's breaking and entering; and (4) appellant's use of a weapon. The military judge cited Mil. R. Evid. 412 and ruled that "the probative value of the evidence as proffered by the defense is outweighed by the danger of [unfair] prejudice." [17]

The military judge stated that his decision was based on the evidence presented so far in the case and the defense offer of proof. The military judge offered to revisit the issue if subsequently raised by the evidence or by defense counsel. Trial defense counsel did not ask the military judge to revisit this issue after the consent and mistake of fact defenses were introduced through appellant's statements to the police.[18]

In sum, we conclude the circumstances of the prior sexual conduct were sufficiently dissimilar to the charged conduct, resulting in low probative value. Even if the military judge's decision to exclude the evidence was an abuse of discretion, the government case was strong, and we conclude that any error was harmless beyond a reasonable doubt.

### B. Evidence

### Mrs. Andreozzi's Testimony

In October 1997, appellant and his wife jointly filed for divorce. Mrs. Andreozzi wanted the divorce; appellant did not, as he wanted to talk and work it out. Although appellant and Mrs. Andreozzi continued to live in the same house for some time after they filed for divorce, they had separate bedrooms. In December 1997, appellant moved out. Mrs. Andreozzi paid appellant $8,500.00 in exchange for appellant's quit claim deed to their house. Appellant changed the locks on

---

**16.** The military judge erroneously failed to seal the record of the hearing as required by Military Rule of Evidence [hereinafter Mil. R. Evid.] 412(c)(2). The trial record of the Mil. R. Evid. 412 hearing is sealed. *United States v. Banker*, 60 M.J. 216, 223 n. 4 (C.A.A.F.2004).

**17.** The Mil. R. Evid. 412(c)(3) balancing test is discussed in footnotes 28 and 32, *infra*.

**18.** The issue of the admissibility of the evidence was preserved because "the substance of the evidence was made known to the military judge by offer." Mil. R. Evid. 103(a)(2). The defense offer of proof was sufficient for "the military judge to make an informed ruling and permits the appellate courts to review that ruling to determine whether exclusion of the evidence resulted in reversible error." *See United States v. Shaffer*, 46 M.J. 94, 98 (C.A.A.F.1997) (quoting *United States v. Means*, 24 M.J. 160, 162 (C.M.A. 1987)).

the front door of Mrs. Andreozzi's house for her. Mrs. Andreozzi did not change the lock on the door from the house to the garage because she changed the code to the garage door opener. Appellant was not allowed to enter Mrs. Andreozzi's residence without her permission. After appellant moved out, Mrs. Andreozzi said that she helped appellant decorate his condominium because she was "trying to be nice."

Four days before the charged sexual offenses occurred, Mrs. Andreozzi was at a bar in Colorado Springs. Appellant saw Mrs. Andreozzi and attempted to talk to her; she became upset because she did not want to talk to him. Mrs. Andreozzi went into the restroom with her girlfriend and cried. The bar manager asked appellant to leave; appellant complied and left. The next day appellant sent Mrs. Andreozzi a message indicating he wanted to talk to her. After several calls between the two, Mrs. Andreozzi finally reached appellant on 20 January 1998. In her telephone conversation, she told appellant there was nothing to talk about but invited him to her residence that evening to finalize their divorce papers.

After talking to appellant, Mrs. Andreozzi told her co-worker and girlfriend, M, that she was going to meet appellant at her home after work. Just before she left work at the end of the day, Mrs. Andreozzi told another co-worker and girlfriend, W, that she was meeting appellant at her residence to finalize things, and that if Mrs. Andreozzi did not "show up for work the next day to call the police [because] he'd killed me."

At 1745, Mrs. Andreozzi entered her residence through her garage. She went upstairs into her bedroom. She noticed appellant standing against the wall by her bedroom door. Mrs. Andreozzi had not given appellant permission to enter her residence in her absence. Appellant said, "We're going to finalize [things], and I'm going to do the talking and you're going to listen." He was wearing black pants, black shirt, black tennis shoes, black gloves, and a shoulder holster with a pistol.

When Mrs. Andreozzi saw appellant's pistol, she became frightened and ran toward the ground-floor level of her residence. She made it down two steps before appellant, a physically powerful weight-lifter and former semi-pro football player, grabbed her. Mrs. Andreozzi started to scream, but appellant covered her mouth and nose with his hand and told her to stop.

Appellant picked Mrs. Andreozzi up and took her into her bedroom against her will and said they were going to play a "game." If Mrs. Andreozzi did everything as appellant directed, then appellant would "just kill himself." If Mrs. Andreozzi did not perform as he ordered, he would kill her and then himself. Appellant repeatedly reminded Mrs. Andreozzi that she had better play "the game" or she would suffer adverse consequences and that, if the police intervened, "he wanted to go out in a blaze."

The rules of "the game" required Mrs. Andreozzi to answer appellant's questions honestly because someone was watching her and her phones were tapped. As proof, appellant accurately described events, plans, and telephone conversations that Mrs. Andreozzi had not discussed with him. Appellant also told Mrs. Andreozzi what she was wearing the previous Sunday and about other activities inside her residence, including what she had eaten for dinner. Appellant then demanded that Mrs. Andreozzi name the men with whom she had slept.[19] Appellant also said he had placed hits on M and six or seven of Mrs. Andreozzi's male and female acquaintances. Mrs. Andreozzi begged appellant not to execute a "hit" on M because she had a seven-year-old son. Appellant at first said it was too late, but eventually left a coded telephone message purporting to call off the hit on M.

Mrs. Andreozzi and appellant went downstairs to her residence's main level. Mrs. Andreozzi complied with appellant's demand and gave her wedding ring to him. Appellant then said it was "till death do us part. And that's what's going to happen tonight."

19. Because of the nature of her work in mortgage lending, Mrs. Andreozzi had several male, work-related friends.

Mrs. Andreozzi asked him to return her wedding ring; he responded that Mrs. Andreozzi could get it from the coroner after he shot himself.

Appellant ordered Mrs. Andreozzi to be a "drunken slut" for him. Mrs. Andreozzi obeyed appellant when he told her to drink three shots of alcohol. Appellant had one drink himself. Mrs. Andreozzi got on her knees and begged appellant not to kill her and himself because it would not be fair to their families. Then she sat on appellant's lap and said, "Please don't do this." Mrs. Andreozzi grabbed appellant's 9 mm pistol that was lying on the table; he grabbed her hand and told her to put it down. Mrs. Andreozzi then said she did not think it was loaded—appellant removed the clip and showed her that it was loaded.

Mrs. Andreozzi went back upstairs because appellant again ordered her to be a "drunken slut." Appellant put his 9 mm pistol on her bed. Appellant told Mrs. Andreozzi to undress, took her pink bra and panties out of a dresser, threw them at her, and told her to put them on. Appellant told her it was part of "the game" and watched her change. After she changed, Mrs. Andreozzi complained about being cold. Appellant took his pistol and the telephone with him as he went downstairs to turn on the heat. Appellant did not want Mrs. Andreozzi to get away; he even insisted on being with her while she completed intimate bodily functions in the bathroom. Mrs. Andreozzi knew a loaded .22 caliber pistol and a shotgun were under her bed, but she did not attempt to get them because she had limited experience with the weapons, and was unsure about the operation of the safety.

After he returned from adjusting the thermostat, appellant put his penis into Mrs. Andreozzi's mouth. Mrs. Andreozzi was crying and complaining that her mouth hurt.

Appellant told her to shut up and that it was part of "the game." Mrs. Andreozzi put appellant's penis back into her mouth. Appellant told her to masturbate and then he performed oral sex upon her, even though she was on her menstrual cycle. Appellant asked her if she wanted him inside of her and because she was scared, she responded that she did. During the sexual activity and in response to appellant's question, Mrs. Andreozzi said, "It was good."

Mrs. Andreozzi testified that she thought appellant would kill her if she did not cooperate with his sexual demands. She denied wanting oral sex or sexual intercourse with appellant, explaining, "There was a gun there and it was part of the game. And if I didn't play the game he told me he'd kill me. So I said yes." Without the gun she would not have agreed to have sex with appellant. She also testified, however, that she still cared for appellant.

After having sex, appellant told Mrs. Andreozzi, "I have to kill myself now. ... I've broken into the house.... I held you at bay for over 3 hours. And I just raped you." Appellant put his pistol into his mouth and said he was going to blow his head off in front of her. She begged appellant not to shoot himself. Appellant responded by putting the 9 mm pistol on the bed. Mrs. Andreozzi said she would not tell anyone about what appellant had done provided he went into counseling.

About five minutes later, the doorbell rang. Mrs. Andreozzi said she would get rid of whoever was at the door. When she answered it, two police officers were there.[20] After stepping outside and nodding in response to police questions about whether her husband was inside with a gun, Mrs. Andreozzi ran over to her neighbor's residence. Mrs. Andreozzi was crying and hysterical.[21]

**20.** Earlier that evening appellant permitted Mrs. Andreozzi to leave a telephone message for M indicating that Mrs. Andreozzi was sick and that M should not come over that evening. M called back and said on Mrs. Andreozzi's answering machine that unless Mrs. Andreozzi picked up the phone, M was coming over. At this point, appellant threatened to kill anyone who came over, so Mrs. Andreozzi picked up the phone. Mrs. Andreozzi attempted to convince M that she was sick and that M should not come over.

Appellant listened to the entire conversation. Later that evening, another friend and co-worker called. Mrs. Andreozzi hinted that something was wrong. Mrs. Andreozzi's friends discussed the situation among themselves. Eventually one of Mrs. Andreozzi's friends contacted the police and asked them to check on Mrs. Andreozzi.

**21.** Police officers testified that when Mrs. Andreozzi answered the door, at 2110 hours, she was

She told the police and her neighbor that appellant threatened to kill her if she did not play "the game" with him.

### Appellant's Statements to Police

Several police officers testified about appellant's actions and oral statements that evening. Appellant ran away from Mrs. Andreozzi's residence, eluding police apprehension for about twenty-five minutes. Appellant was wearing a dark colored sweat suit and tennis shoes.

Appellant told the police on 20 January 1998 that he parked his car several blocks away from Mrs. Andreozzi's residence because he was concerned that the neighbors would call the police. Appellant entered Mrs. Andreozzi's residence "to prove a point to his wife because of all the other gentlemen ... that had been staying over at the house and she hadn't been changing any locks." Mrs. Andreozzi "kind of freaked out" when she saw him. Appellant tried to comfort her, but she started to run down the stairs. He grabbed her around the waist and then may have mistakenly grabbed her around the mouth. They went downstairs where appellant had a drink and he "let her stop" after four drinks.

Mrs. Andreozzi kept saying to appellant, "You're going to kill me." He replied that he was "the only one that was going to die tonight." Then Mrs. Andreozzi sat on appellant's lap and told him that she "didn't want him to do anything to himself." They went back upstairs and Mrs. Andreozzi put on her pink bra and panties at appellant's request. Appellant attempted to kiss her breasts, but Mrs. Andreozzi covered them with her hands. He put her hands to her sides without any force, and then kissed her breasts.

Appellant asked for oral sex, but Mrs. Andreozzi said she did not want to because her lip hurt. Appellant did not put his penis into Mrs. Andreozzi's mouth. Instead, appellant engaged in cunnilingus with her, during which she stated "it feels good" and urged him to continue. Appellant asked, and Mrs. Andreozzi agreed, to engage in sexual inter-course with him. Appellant stopped the intercourse because she was bleeding and it hurt. Appellant said the sexual activity was consensual and without force. Appellant denied pointing his pistol at Mrs. Andreozzi and said he pointed it at himself. He also denied threatening Mrs. Andreozzi with harm, telling her, instead, that "the only one who will be leaving in a body bag would be me." He told the police that he did not go to Mrs. Andreozzi's residence to harm or scare her and that he left her wedding ring on the bed.[22]

Initially, appellant repeatedly stated to the police that the only weapon he had was a .22 caliber pistol in Mrs. Andreozzi's residence, which was located in a holster under her bed. Later, appellant contradicted himself, saying that Mrs. Andreozzi handled his 9 mm pistol, and he took it from her and admonished her to be careful. Appellant led the police later that evening to the location of the 9 mm pistol; it was lying in a pile of dirt about fifteen to twenty feet from a home. Appellant's pistol had a 9 mm hollow point round chambered. The police recovered appellant's shoulder holster for his 9 mm pistol from Mrs. Andreozzi's bedroom, and appellant's gym bag from Mrs. Andreozzi's residence. Appellant described some of the contents of his gym bag, but did not tell the police that his gym bag contained unused condoms, a door opener to Mrs. Andreozzi's garage, a key for the door leading from the garage to the house, and latex gloves. The police noticed, but did not ask appellant why he had very clean towels covering the seats of his car.

### Other Evidence

The testimony of Mrs. Andreozzi's co-workers corroborate Mrs. Andreozzi's description of how the police were notified. Other witnesses described Mrs. Andreozzi as hysterical after the police arrived. A neighbor testified that Mrs. Andreozzi tearfully told her, shortly after the police arrived, appellant broke into her home and was going to kill her or himself. Mrs. Andreozzi said

---

wearing her bathrobe, and was "nervous, upset, [and] shaking." Her lip was bleeding.

**22.** In fact, appellant took Mrs. Andreozzi's wedding ring when he left on 20 January 1998, and the defense returned it to her prior to trial.

she was embarrassed because appellant made her have sex with him. She said she had to go along with what appellant wanted because he had a gun. Mrs. Andreozzi told the neighbor that appellant said she could not tell the police because "[s]he had agreed to it" and "it was consensual." Her neighbor, however, convinced Mrs. Andreozzi to report appellant's sex with her to the police. Mrs. Andreozzi also told a nurse at the hospital, who specialized in sexual assaults, about "the game," appellant's threat, and the ensuing sexual activity.

Appellant sent a Valentine's Day card and a handwritten letter to Mrs. Andreozzi from pretrial confinement, attempting to dissuade her from testifying against him. Appellant did not deny the offenses or urge her to tell the truth in the card or letter. He told her he would give her everything in his savings account if she did not testify.[23] Appellant also asked his father to call Mrs. Andreozzi to discuss the probable adverse impact of her testimony on appellant.

### C. Discussion

■ The standard of review for the admissibility of evidence is abuse of discretion.[24] We evaluate the military judge's decision from the same vantage point as the military judge, that is considering only Mrs. Andreozzi's testimony and the defense proffer. If the excluded evidence is Constitutionally required, we are not permitted to affirm unless the error is harmless beyond a reasonable doubt. *See Olden v. Kentucky,* 488 U.S. 227,

232–33, 109 S.Ct. 480, 102 L.Ed.2d 513 (1988); *Delaware v. Van Arsdall,* 475 U.S. 673, 681, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).

Military Rule of Evidence 412 is intended to " 'safeguard the alleged victim against the invasion of privacy, potential embarrassment and sexual stereotyping.' " [25] " '[T]he rule also encourages victims of sexual misconduct to institute and to participate in legal proceedings against alleged offenders.' " [26] "[E]vidence of a victim's past sexual behavior with persons other than the accused is not admissible unless [C]onstitutionally required to be admitted." *Carter,* 47 M.J. at 396 (citing Mil. R. Evid. 412(b)(1)). On the other hand, "evidence of specific instances of sexual behavior by the alleged victim with respect to the person accused of the sexual misconduct offered by the accused to prove consent" under Mil. R. Evid. 412(b)(1)(B) "is admissible, if otherwise admissible under these rules." [27]

Under Mil. R. Evid. 412, "the military judge applies a two-part process of review to determine if the evidence is admissible." *Banker,* 60 M.J. at 222. First, the military judge determines if the evidence is relevant under Mil. R. Evid. 401. *Id.* Second, if relevant, the military judge applies the Military Rule of Evidence 412(c)(3) balancing test. *Id.* Even if admissible under Mil. R. Evid. 412, the evidence may still be excluded under

**23.** Appellant's communications with Mrs. Andreozzi from pretrial confinement were admissible to show consciousness of guilt. *See United States v. Cook,* 48 M.J. 64, 66 (C.A.A.F.1998).

**24.** *United States v. Tanksley,* 54 M.J. 169, 175 (C.A.A.F.2000), *overruled in part on other grounds, United States v. Inong,* 58 M.J. 460, 464 (C.A.A.F.2003); *see United States v. Carter,* 47 M.J. 395, 397 (C.A.A.F.1998).

**25.** *United States v. Lauture,* 46 M.J. 794, 797 (Army Ct.Crim.App.1997) (quoting Federal Rule Of Evidence 412, Advisory Committee Notes [hereinafter Fed. R. Evid.] 412, Advisory Notes); *see Michigan v. Lucas,* 500 U.S. 145, 149–50, 111 S.Ct. 1743, 114 L.Ed.2d 205 (1991). For nonconsensual offenses, Mil. R. Evid. 412 is "somewhat broadened" as compared to Fed. R. Evid. 412, and both rules have the same purpose. *See Banker,* 60 M.J. at 221; Mil. R. Evid. 412

analysis, at A22–35. In 1994, Fed. R. Evid. 412 was amended making its protections equally applicable to both consensual and nonconsensual sexual offenses. We recommend changing the *Manual for Courts–Martial* so that Mil. R. Evid. 412 and Fed. R. Evid. 412 explicitly apply to all sexual offenses. *See Banker,* 60 M.J. at 219–20 (interpreting Mil. R. Evid. 412 to be applicable to all prosecutions involving alleged sexual misconduct).

**26.** *United States v. Ramone,* 218 F.3d 1229, 1235 (10th Cir.2000) (quoting Fed. R. Evid. 412, Advisory Notes); *see also United States v. Hurst,* 29 M.J. 477, 480 (C.M.A.1990).

**27.** *Id. See also Banker,* 60 M.J. at 221; Howard J. Alperin, Annotation, *Propriety of Cross–Examining Witness as to Illicit Relations with Defendant in Criminal Case,* 25 A.L.R.3d 537, § 6 (update Mar. 2003).

the Mil. R. Evid. 403 balancing test.[28] Ultimately, the Constitution may require admissibility of the evidence. *Id.* at 222.

Based on the aforementioned analysis, we conclude that evidence of Mrs. Andreozzi's sexual activity with appellant in November 1997 is inadmissible under Military Rules of Evidence 412 and 403, and its admission is not Constitutionally required.

First, we disagree with the military judge that the evidence of appellant's prior sexual activity with Mrs. Andreozzi in November 1997 after she filed for divorce and they began sleeping in separate bedrooms was not relevant to show her consent to sexual activity on 20 January 1998. Military Rules of Evidence 401 and 402 provide that evidence having " 'any tendency to make the existence of any fact ... more or less probable than it would be without the evidence' is legally relevant and admissible." *United States v. Sanchez,* 44 M.J. 174, 178 (C.A.A.F.1996) (citation omitted).

Relevance of prior sexual activity between an accused and an alleged victim is increased by the degree of its similarity to the charged conduct, and whether the sexual activity is distinctive and unusual.[29] There are several aspects of the sexual activity involving appellant and his wife in November 1997 and the charged conduct on 20 January 1998 that are similar: (1) the sexual activity involved sodomy, intercourse, and masturbation; (2) the sexual activity occurred at Mrs. Andreozzi's residence; and (3) the legal status of their marriage was unchanged.

However, in this case the dissimilar characteristics reduce the relevance to a minimal level. The defense did not assert that in November 1997 appellant entered Mrs. Andreozzi's residence without her consent, or that the sexual activity was forcible, part of any "game," or involved threats or a firearm. The evidence was unrebutted that on 20 January 1998, appellant: (1) entered Mrs. Andreozzi's locked residence in her absence and without her permission; (2) upon her discovery of his presence, grabbed and held Mrs. Andreozzi, cutting her lip and establishing his dominance and control; (3) threatened to kill anyone who came to her residence; and (4) used a firearm to frighten and coerce Mrs. Andreozzi. Under these circumstances, the excluded evidence was more dissimilar than similar, and had minimal relevance and low probative value to the issue of consent.[30]

Second, we agree with the military judge that the Mil. R. Evid. 412(c)(3) balancing test does not require admission of this evidence because "the probative value of such evidence [does not] outweigh the danger of unfair prejudice" to the accused. *See Banker,* 60 M.J. at 222 (stating Mil. R. Evid. 412(c)(3) balancing test applies "to all three of the enumerated exceptions").

Even assuming its admissibility under Mil. R. Evid. 412, we conclude that this evidence may be excluded under Mil. R. Evid. 403. "[U]nder Mil. R. Evid. 403, evidence which is both legally and logically relevant 'may be excluded if its probative value is substantially outweighed by the danger of undue prejudice.' " [31] "[Military Rule of Evidence] 412 does not wholly supplant [Mil. R. Evid.] 403 since the military judge may exclude evidence on [Mil. R. Evid.] 403 grounds even if that evidence would otherwise be admissible

---

**28.** *Id.* at 223 n. 3. If the balancing test in Mil. R. Evid. 412(c)(3) is met, the evidence "shall be admissible," whereas if the balancing test in Mil. R. Evid. 403 is met, relevant evidence may be excluded. The proponent's burden and the presumption of admissibility under each rule "lean in different directions: i.e., toward inclusion in the case of [Mil. R. Evid.] 403 and toward exclusion in the case of [Mil. R. Evid.] 412(c)(3)." *Id.*

**29.** *See United States v. Velez,* 48 M.J. 220, 226–27 (C.A.A.F.1998) ("[C]oncurrence of underlying details in both stories, *i.e.,* drinking, wanting to play pool, being with a Marine who was not her husband, and some sexual act[,] are not so

'unique' as to suggest contrivance or falsehood on the alleged victim's part.").

**30.** *Cf. United States v. Bear Stops,* 997 F.2d 451, 453–58 (8th Cir.1993) (reversing conviction for sexual abuse); *United States v. Powers,* 59 F.3d 1460, 1470 (4th Cir.1995) (finding evidence of victim's subsequent sexual activity irrelevant to accused's guilt).

**31.** *Sanchez,* 44 M.J. at 178 (citation omitted) (applying Mil. R. Evid. 403 to Mil. R. Evid. 412 evidence); *see also Banker,* 60 M.J. at 223; *Lauture,* 46 M.J. at 798–99.

under [Mil. R. Evid.] 412." [32] "[T]he policy of Mil. R. Evid. 412, to guard against unwarranted intrusion into the victim's private life, may be taken into account in determining the amount of unfair prejudice under Rule 403." [33]

Citing FED. R. EVID. 403, the Tenth Circuit determined that the trial judge properly excluded evidence of prior consensual sexual activity involving the use of objects between the victim and the accused. *See Ramone*, 218 F.3d at 1237–38. The *Ramone* Court determined that such prior conduct would not be probative of whether sexual assault with a flashlight, which the victim said the accused inserted both vaginally and anally after beating her, was consensual. *Id.* at 1232, 1237–38. Several state court decisions have also held evidence of prior sexual activity between the victim and accused inadmissi-

ble under rape shield statutes similar to FED. R. EVID. 412. [34]

We hold that the military judge did not abuse his discretion when he refused to permit Mrs. Andreozzi's cross-examination about the two prior instances of sexual activity in November 1997. Military Rule of Evidence 412(c)(3) does not require admissibility because the "probative value of [the] evidence [is] outweigh[ed] by the danger of unfair prejudice." The evidence is inadmissible because under Mil. R. Evid. 403, whatever limited probative value this evidence did have was "substantially outweighed by the danger of unfair prejudice [and] confusion of the issues." [35]

■ Even though we have determined that the evidence is inadmissible under the

---

**32.** *Banker*, 60 M.J. at 223 n. 3; *United States v. Williams*, 37 M.J. 352, 360 n. 7 (C.M.A.1993) (discussing relationship between Mil. R. Evid. 403 and 412). In 1994, FED. R. EVID. 412 was amended, eliminating the balancing test for criminal cases that was retained in Mil. R. Evid. 412(b)(3). *Compare* P.L. 100–690, Title VII, Subtitle B, § 7046(a), 102 Stat. 4400 (Nov. 18, 1988) *with* P.L. 103–322, Title IV, Subtitle A, ch 4, § 40141(b), 109 Stat. 1919 (Sept. 13, 1994). We recommend elimination of the Mil. R. Evid. 412(c)(3) balancing test. As noted in the Commentary to FED. R. EVID. 412:

> [I]f a specific act is offered for one of the two limited purposes provided, the act is admissible so long as it also satisfied Rule 403. *See, e.g.*, *United States v. One Feather*, 702 F.2d 736 (8th Cir.1983) (evidence that fits one of the Rule 412 exceptions can nonetheless be excluded [under Rule 403] if the probative value is substantially outweighed by the prejudicial effect). That is, there is no heightened exclusionary balancing test applied. This makes sense, since if the evidence is narrow enough to fit one of the limited exceptions to subdivision (b)(1), there is little reason to filter it further through a strict exclusionary balancing test.

FED. R. EVID. 412 cmt. (2004). Currently, federal civilian appellate courts apply the FED. R. EVID. 403 balancing test to exclude that which is otherwise admissible under FED. R. EVID. 412. WEINSTEIN'S FEDERAL EVIDENCE § 412.03[1] (2003) ("The Advisory Committee Note to the 1994 Amendment [to FED. R. EVID. 412] states that evidence 'offered for the specific purpose identified in this subdivision may still be excluded if it does not satisfy Rules 401 or 403.'" (citation omitted)).

**33.** Marjorie A. Shields, Annotation, *Admissibility in Sex Offense Case, Under Rule 412 of Federal Rules of Evidence, of Evidence of Victim's Past Sexual Behavior*, 166 A.L.R. FED. 639, § 3b (update May 2003) (citing *One Feather*, 702 F.2d 736).

**34.** *See, e.g.*, *People v. Lucas*, 201 Mich.App. 717, 507 N.W.2d 5, 6 (1993) (holding no error in rape case where evidence of complainant's prior sexual relationship with defendant not admitted because preclusion did not prevent defense of consent and day-of-trial decision for admission suggested tactical decision); *State v. Lykken*, 484 N.W.2d 869, 874–75 (S.D.1992) (permitting evidence of prior sexual relationship with victim but excluding pictures and explicit testimony of prior sexual activities because of "substantial danger of unfair prejudice, confusion of issues or needless presentation of cumulative evidence"); *People v. Zysk*, 149 Mich.App. 452, 386 N.W.2d 213, 216–17 (1986) (finding prior sexual episodes between complainant and defendant inadmissible because such episodes "were distinct and unrelated to the brutal acts involved in the charged offense" and "highly prejudicial"); *People v. Hastings*, 72 Ill.App.3d 816, 28 Ill.Dec. 683, 390 N.E.2d 1273, 1277 (1979) (excluding evidence of past sexual activity because complainant's previous consensual sex with defendant did not mean she "consented to the acts committed on the night in question").

**35.** Mil. R. Evid. 403; *see Ramone*, 218 F.3d at 1237–38; *United States v. Galloway*, 937 F.2d 542, 548 (10th Cir.1991) (stating court has discretion to exclude evidence of past sexual behavior in certain cases where FED. R. EVID. 412 inapplicable), *vacated en banc on other grounds*, 56 F.3d 1239 (10th Cir.1995); *United States v. Blue Horse*, 856 F.2d 1037, 1040–41 (8th Cir. 1988) (finding no error where medical records indicating past sexual activity excluded).

military rules of evidence, we must also determine whether the military judge's restriction on Mrs. Andreozzi's cross-examination meets Constitutional standards—keeping in mind that "'trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on ... cross-examination based on concerns about ... harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" *United States v. Byrne*, 171 F.3d 1231, 1234 (10th Cir.1999) (quoting *Van Arsdall*, 475 U.S. at 679, 106 S.Ct. 1431). There is a three-part test to determine whether evidence is Constitutionally required to be admitted: the evidence must be relevant, material, and favorable to the defense. *See United States v. Williams*, 37 M.J. 352, 359 (C.M.A.1993). "Relevance is the key to determining when the evidence is [C]onstitutionally required to be admitted," and this determination must be made on a "case-by-case basis." [36] Constitutional relevance is shown, for example, by "'testimony proving the existence of a sexual relationship that would have provided *significant* evidence on an issue of *major importance* to the case.'" [37] Recently, the United States Court of Appeals for the Armed Forces has explained that, "[w]hile the term 'favorable' may not lend itself to a specific definition, we believe that based on Supreme Court precedent and our own Court's rulings in this area, the term is synonymous with 'vital.'" *Banker*, 60 M.J. at 222 (citations omitted). We hold that there is no Constitutional requirement for admission because the excluded evidence was not of major importance or vital to appellant's consent defense.

Applying these factors, we conclude that Mrs. Andreozzi's consensual sexual inter-

course with appellant while they were still married, but after they had filed for divorce, was minimally relevant, but not crucial to determining appellant's guilt to the charged sexual offenses.

■ Assuming *arguendo* the evidence of prior sexual activity was admissible, the exclusion of the evidence was harmless beyond a reasonable doubt.[38] Harmless error depends on multiple factors:

These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Olden*, 488 U.S. at 233, 109 S.Ct. 480 (quoting *Van Arsdall*, 475 U.S. at 679, 106 S.Ct. 1431). The strength of the government's case is a critical factor in establishing whether any error was harmless beyond a reasonable doubt. As noted above, appellant's own statements to the police, the physical evidence, and appellant's behavior after commission of his crimes substantially corroborated Mrs. Andreozzi's testimony.

Additionally, while considering the potential impact the excluded evidence may have had, we note that the military judge did allow ample cross-examination of Mrs. Andreozzi concerning her relationship with appellant, both before and after 20 January 1998. His rulings allowed appellant to argue his theory of the case that Mrs. Andreozzi either consented or appellant mistakenly believed she consented. After reviewing all the evidence, the strength of the government's case, the

---

**36.** *Carter*, 47 M.J. at 396 (internal quotation marks omitted) (quoting *Jensen*, 25 M.J. at 286, and *United States v. Buenaventura*, 45 M.J. 72, 79 (C.A.A.F.1996), respectively).

**37.** *Id.* (emphasis added) (quoting *United States v. Moulton*, 47 M.J. 227, 229 (C.A.A.F.1997)); *United States v. Pagel*, 45 M.J. 64, 70 (C.A.A.F.1996) ("Evidence is also [C]onstitutionally required to be admitted when the evidence is 'so particularly unusual and distinctive as to verify the defendant's version.'" (quoting *Sanchez*, 44 M.J. at 179–80)).

**38.** *See Hubbeling v. United States*, 288 F.3d 363, 367 (8th Cir.2002) (holding failure to introduce evidence under FED. R. EVID. 412, of consensual sex acts by victim as alternate explanation for her injuries, was not prejudicial because it was unreasonable that jury would have found differently had they heard the evidence); *United States v. Yazzie*, 59 F.3d 807, 814–15 (9th Cir.1995) (finding harmless error where evidence of other sexual acts not admitted because such evidence did not contradict victim's extensive account of sexual abuse).

relative importance of Mrs. Andreozzi's credibility in light of appellant's corroborating statements, and the avenues the military judge allowed for impeachment, we believe that if any error occurred it was harmless beyond a reasonable doubt. *See id.* at 232–33, 109 S.Ct. 480; *Van Arsdall,* 475 U.S. at 681, 106 S.Ct. 1431.

## IV. HEARSAY INSTRUCTION

### A. Evidence

Jeffrey Danzinger, appellant's high school friend, testified as a defense witness on findings. Three times during direct examination, he related that appellant, prior to the offense, had told him that appellant wanted to preserve his marriage.[39] The military judge sustained trial counsel's hearsay objections. After the second objection, the military judge instructed the members to disregard the "testimony with regard to what [appellant] might have told his friend." After the third objection, the military judge explained:

> Members of the Court, you can't consider that part of the testimony. It is not before you. It is hearsay testimony. The trial counsel has not had an opportunity to cross-examine the person who allegedly made the statement; therefore, you may not consider it.
>
> Do you understand it?
>
> Apparently so.

At an Article 39(a), UCMJ, session the defense moved for a mistrial, arguing that the judge's last instruction was a comment upon the accused's right to remain silent. The military judge denied the motion for a mistrial and stated that he planned to give the Military Judges' Benchbook instruction if appellant failed to testify.[40] The defense then rested without a request for additional relief and without calling appellant as a witness. Immediately thereafter, the military judge instructed the members, as follows:

> [T]he accused has an absolute right to remain silent. . . . you will not draw any adverse inference to the accused from the fact that he elected to exercise his [C]onstitutional right. The fact that Sergeant Andreozzi has not testified must be disregarded by you.
>
> Do you understand that instruction?
>
> Apparently so.

During the instructions prior to findings, the military judge again provided the Benchbook instruction: "[Appellant] has an absolute legal [C]onstitutional right to remain silent. You will not draw any adverse inference to the soldier from the fact that he did not testify as a witness. The fact that he has not testified must be disregarded by you." The members did not ask any questions regarding this instruction, and trial defense counsel did not object or request additional instructions.

### B. Discussion

■ "It is black letter law that a trial counsel [or the military judge] may not comment directly, indirectly, or by innuendo, on the fact that an accused did not testify in his defense." *United States v. Mobley,* 31 M.J. 273, 279 (C.M.A.1990) (citing *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965)). The military judge's reference to appellant's failure to testify was error. *See id.*

The Court of Appeals for the Armed Forces explained that appellate courts should not overturn a military judge's decision denying a mistrial absent an abuse of discretion. *United States v. Dancy,* 38 M.J. 1, 6 (C.M.A. 1993). " 'Declaration of a mistrial is a drastic remedy, and such relief will be granted only to prevent a manifest injustice against the

---

**39.** The first time the witness was about to testify about appellant's desire to save his marriage, he was stopped due to a timely government objection. Thereafter, the witness twice specifically mentioned appellant's desire to "preserve" his marriage before the government was able to object.

**40.** *See* Dep't of Army, Pam. 27–9, Legal Services: Military Judges' Benchbook [hereinafter Benchbook], para. 7–12 (30 Sept. 1996). This instruc-

tion, which is frequently given as part of findings instructions when an accused does not testify, remains the same in the current 15 September 2002 Benchbook. The current Benchbook, however, also includes a more tailored instruction that was not in effect at the time of appellant's trial; specifically, paragraph 2–7–20 relates to situations where there is some in-court comment on an accused's right to remain silent.

accused.' It is appropriate only 'whenever circumstances arise that cast substantial doubt upon the fairness or impartiality of the trial.' "[41]

When comments have drawn the members' attention to the accused's silence, the military judge must provide curative instructions to the members.[42] A curative instruction instead of declaring a mistrial is appropriate so long as " 'the curative instruction avoids prejudice to the accused.' " *Barron*, 52 M.J. at 4–5 (quoting *Rushatz*, 31 M.J. at 456). Such instructions may ameliorate the damage done by improper comments. *Mobley*, 34 M.J. at 531.[43]

When an error of Constitutional proportion has been committed, the reviewing court may only affirm the conviction upon a finding that the error was harmless beyond a reasonable doubt.[44] The military judge's improper statement was an extremely brief, isolated, and indirect reference to appellant's right not to testify. He promptly instructed the members to disregard appellant's failure to testify. This "instruction was protective in nature and expressly directed the members to refrain from drawing any inference" from appellant's failure to testify. *United States v. Gray*, 51 M.J. 1, 38 (C.A.A.F.1999) (holding that trial counsel's comment on appellant's assertion of his right to remain silent cured by instruction). The defense did not request any additional instructions regarding appellant's failure to testify. *See Sidwell*, 51 M.J. at 265 (listing factors in prejudice analysis). Finally, trial counsel did not exploit appellant's failure to testify, and government's case was overwhelming. We are satisfied beyond reasonable doubt that the military judge's instructions to disregard appellant's failure to testify cured any prejudice to appellant.

The findings of guilty and the sentence are affirmed.

Judge SCHENCK concurs.

BARTO, Judge, concurring in part and dissenting in part.

I concur with my colleagues that the evidentiary and instructional errors made by the military judge in this matter are harmless beyond a reasonable doubt. However, I respectfully dissent with that portion of the majority opinion concerning appellant's forum choice because the second order issued by this court directing the collection of evidence on this issue was unnecessary and exceeded the bounds of permissible fact finding.[1]

It is beyond cavil that a Court of Criminal Appeals may "determine controverted questions of fact" when "considering the record." UCMJ art. 66(c). Post-trial fact-finding sessions ordered by military appellate courts are not a new phenomenon. *See United States v. DuBay*, 17 U.S.C.M.A. 147, 37 C.M.R. 411, 1967 WL 4276 (1967). The use of these sessions, however, has usually been limited to those circumstances in which the relevant facts are not "apparent on the face of the record." *Id.* at 413. Such circumstances generally involve allegations of un-

---

41. *Id.* (citations omitted), *cited with approval in United States v. Barron*, 52 M.J. 1, 4 (C.A.A.F. 1999); *see United States v. Rushatz*, 31 M.J. 450, 456 (C.M.A.1990); *United States v. Rosser*, 6 M.J. 267, 270–71 (C.M.A.1979).

42. *United States v. King*, 13 M.J. 863, 867 (N.M.C.M.R.1982) (citing *United States v. Jackson*, 6 M.J. 116 (C.M.A.1979)).

43. The members are "presumed to follow instructions, until demonstrated otherwise." *United States v. Washington*, 57 M.J. 394, 403 (C.A.A.F.2002) (Baker, J., concurring) (citing *United States v. Holt*, 33 M.J. 400, 408 (C.M.A. 1991)); *see Lakeside v. Oregon*, 435 U.S. 333, 340, 98 S.Ct. 1091, 55 L.Ed.2d 319 (1978); *United States v. Jenkins*, 54 M.J. 12, 20 (C.A.A.F. 2000).

44. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *see also United States v. Mason*, 59 M.J. 416, 424 (C.A.A.F.2004); *United States v. Sidwell*, 51 M.J. 262, 265 (C.A.A.F.1999); *United States v. Brooks*, 25 M.J. 175, 180 (C.M.A.1987).

1. I do not "regret[ ] joining" the second order by this court in this matter. I articulated my concerns to my colleagues prior to the issuance of the order in question, but did not publish a dissent because dissent to an order that enjoyed the support of the majority of judges on the panel would have had no meaningful substantive or procedural effect at that time.

lawful command influence, *see id.*, or ineffective assistance of counsel. *See United States v. Ginn*, 47 M.J. 236, 238 (C.A.A.F.1997).

Appellate courts have also ordered post-trial sessions of this sort to find facts concerning the forum choice of an accused. *See, e.g., United States v. Morgan*, 57 M.J. 119, 120–21 (C.A.A.F.2002); *United States v. Townes*, 52 M.J. 275, 276 (C.A.A.F.2000). This practice is of relatively recent vintage and has not been without criticism. For example, Judge Effron asserted in his dissenting opinion in *Morgan*, "A jurisdictional deficiency cannot be corrected through a post-trial reconstruction of events in a *DuBay* hearing. A post-trial attempt to reconstruct conversations between counsel and client is no substitute for the statutory requirement of a request on the record." 57 M.J. at 125 (citation omitted).

The reason that facts obtained from a *DuBay* hearing cannot cure a jurisdictional deficiency like that in appellant's case is two-fold. First, in "choice-of-forum" cases such as this one, there is typically a clear record of whether appellant or his counsel has made a request for a particular forum—Article 25, UCMJ, requires as much. These facts, however, are not present in appellant's record. Second, investigatory fact finding in search of evidence establishing jurisdiction is properly the province of the government and its representatives, not a criminal appellate court. As our superior court noted long ago, the actions of service courts are "always taken on behalf of an accused and in his interest." *United States v. Zimmerman*, 2 U.S.C.M.A. 12, 20, 6 C.M.R. 12, 20, 1952 WL 2267 (1952).

The instant order was therefore unnecessary because there was already a sufficient record upon which to base our ruling, to wit:

the original record of trial and the record of the first *DuBay* hearing ordered by this court.[2] The fact that the trial counsel detailed to the first *DuBay* hearing failed to establish that appellant had elected trial by a panel containing enlisted members is not and, quite frankly, should not be a concern of this court. Our order was also inappropriate in that it dictated to the government in painstaking detail where it should have looked prior to the first *DuBay* hearing for evidence establishing panel election. For example, the order directed the examination of the computer hard drives and electronic mail servers of counsel and paralegals associated with the case, and went so far as to suggest search terms, e.g., "enlisted," "forum," to be used by the examiners. Notwithstanding the broad mandate of Article 66, UCMJ, the proper function of this court is adjudication, not investigation.[3]

In the absence of the evidence obtained at the second *DuBay* hearing, the record fails to establish substantial compliance at trial with Article 25, UCMJ. As such, I regretfully cannot join in the opinion of the court in this matter. I would set aside the findings of guilty and the sentence, and authorize a rehearing by the same or a different convening authority.

## APPENDIX

### ORDER

WHEREAS:

Appellant filed a Brief on Behalf of Appellant on 14 December 1999;

Appellee filed a Brief on Behalf of Appellee on 11 December 2000;

---

2. Our second, highly-detailed order is attached as an Appendix.

3. I respectfully submit that footnote five of the majority opinion addresses a complaint not made in this dissent. I do not dissent because the military judges who presided over the two *DuBay* hearings somehow exceeded *their* responsibilities. Instead, I dissent because I believe that we exceeded *our* responsibilities with our second order in this matter. In the first place, it is generally not appropriate for this court to grant the government a "do-over" when it fails to make any effort to meet its advocacy burden during a *DuBay* hearing. In such a circumstance, this court should then proceed to decide the question at issue on the basis of the record before us. Even if the circumstances of a case are such that it is appropriate for us to clarify our original order and direct a second post-trial hearing, we should nevertheless refrain from prescribing in our order specific investigative techniques that are likely to aid one party or the other in meeting its advocacy burden.

Appellant filed a Reply Brief on Behalf of Appellant on 21 February 2001;

Appellant filed a Supplemental Brief on Behalf of Appellant on 19 November 2001;

Appellee filed a Supplemental Brief on Behalf of Appellee on 19 December 2001;

**I. Trial by a court-martial panel consisting of at least one-third enlisted members.**

WHEREAS:

Appellant has alleged in his appellate brief, reply brief, and supplemental brief that the record of trial does not indicate his request to be tried by a court-martial panel consisting of at least one-third enlisted members;

Appellant has asserted that because he did not personally request, orally or in writing on the record, a panel that included enlisted members, in accordance with Article 25, Uniform Code of Military Justice, 10 U.S.C. § 825, and cases decided thereunder, his court-martial lacked jurisdiction to try him;

In response to appellant's assertions, appellee has conceded that the military judge erred "in not obtaining on the record appellant's request for a trial by enlisted members." Appellee has asserted substantial compliance with Article 25, UCMJ, and has not moved to attach any affidavits from trial defense counsel, nor provided any evidence that appellant requested trial by enlisted members. *See United States v. Morgan,* 57 M.J. 119 (2002);

This Court ordered a hearing under *United States v. DuBay,* 17 U.S.C.M.A. 147, 37 C.M.R. 411, 1967 WL 4276 (1967), on 28 February 2001;

Three witnesses testified at the *DuBay* hearing held on 14–15 May 2001, at Fort Leavenworth, Kansas: Mr. Michael Duncan, appellant's civilian trial defense counsel, Mr. Sean Rommel, appellant's detailed military trial defense counsel, and appellant;

Mr. Duncan and Mr. Rommel testified that they did not remember appellant communicating to them his particular trial forum request, and they did not remember ever asking the trial counsel to provide any particular trial forum for appellant's trial;

Mr. Rommel testified that he was certain he advised appellant as to appellant's forum options, and if appellant had made a choice, Mr. Rommel would have honored appellant's forum choice;

Mr. Rommel testified that it is his normal practice, after an accused defers forum choice, to provide the trial counsel and the military judge prior to trial a written pleading providing notice of forum choice;

Appellant denied ever requesting any particular trial forum;

It would be ineffective assistance of counsel for trial defense counsel not to ask appellant for his forum decision, to fail to convey that decision to the government for implementation after receiving it, or to fail to object to a court-martial including enlisted members, if such forum was in contravention to appellant's wishes. *See Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984);

Although Mr. Duncan and Mr. Rommel testified at the *DuBay* hearing, no one asked them whether they checked their records (hard copy or computer files) for documentation regarding a request for trial forum;

There was no averment by either counsel at the *DuBay* hearing as to the information or lack of information regarding the issue of trial forum in possession of the trial judge (Lieutenant Colonel Richard Hough), trial counsel (Captain Richard Travis), or other personnel who might have been responsible for processing any trial forum request;

Questions pertaining to whether appellant requested a trial forum of at least one-third enlisted members are not answered by the record of trial and allied papers;

This Court is unable to resolve these issues, in this case, without: (1) affidavits from Lieutenant Colonel Hough, Mr. Duncan, Mr. Rommel, Captain Travis, and those persons occupying the positions at Fort Carson at the time of appellant's trial, of Chief of Military Justice, Criminal Law NCOIC, and Pretrial NCOIC; (2) the results of an examination of the computer hard drives, if still available, of

Mr. Rommel, Captain Travis, and the Fort Carson Chief of Military Justice, Criminal Law NCOIC, and Pretrial NCOIC; and, (3) the results of an examination of the electronic mail server used by Mr. Rommel, Captain Travis, the Fort Carson Chief of Military Justice, Criminal Law NCOIC, and Pretrial NCOIC;

**II. Freedom of Information Act (FOIA), 5 U.S.C § 552, and Army Regulation 25–55, Information Management: Records Management: The Department of the Army Freedom of Information Act Program (1 Nov. 1997) [hereinafter AR 25–55], request for documents and request for abeyance.**

WHEREAS:

On 14 August 2002, appellate defense counsel filed a motion prepared by appellant "to stay judgment or order" in his case until compliance with his request for documents. This motion also seeks a variety of medical records, as well as documents pertaining to nominations of court members citing the FOIA, and AR 25–55;

On 6 September 2002, appellate defense counsel filed a motion to attach additional documents in support of appellant's "additional *Grostefon* matters," which documents indicate that appellant is also seeking a variety of disciplinary records and documents pertaining to victim services; and,

The letter dated 22 January 2001, from the Director of Information Management, 7th Infantry Division and Fort Carson, incorrectly indicates that the Initial Denial Authority (IDA) for documents pertaining to nominations of court members and victim services is the Commander, U.S. Army Criminal Investigation Command, when the correct IDA for court-martial and victim services records is The Judge Advocate General, Attention: Criminal Law Division, 1777 North Kent Street, Rosslyn, VA 22209. *See* AR 25–55, para. 5–200d(14).

NOW, THEREFORE, IT IS HEREBY ORDERED:

**III. Trial by a court-martial panel consisting of at least one-third enlisted members.**

1. That the Clerk of Court shall provide copies of this Order to counsel for appellant and appellee;

2. That the record of trial shall be returned to The Judge Advocate General for such action as is required to conduct a limited *DuBay* hearing, if such hearing is necessary;

3. That such *DuBay* hearing, *if necessary*, will be conducted within ninety days of the date of this Order;

4. That Mr. Duncan and Mr. Rommel will answer, within forty-five days of the service of this Order upon the government, by written affidavit, the following:

(a) Does any documentation exist in your files (computer/electronic or paper) that was created or received between 1 April 1998 and 10 June 1998 pertaining to a request for trial forum by appellant; and,

(b) If there is any such documentation in your files, attach such documents to your affidavit;

5. That Lieutenant Colonel Hough, Captain Travis, and the Fort Carson Chief of Military Justice, Criminal Law NCOIC, and Pretrial NCOIC will answer, within forty-five days of the service of this Order upon the government, by written affidavit, the following:

(a) Did anyone on the defense team request any particular trial forum in appellant's case? If so, what forum was requested? Describe the circumstances of any such request for trial forum;

(b) Is there any documentation in your files (computer/electronic or paper) that was created or received between 1 April 1998 and 10 June 1998 pertaining to a request for trial forum by appellant or appellant's counsel; and,

(c) If there is any such documentation in your files, attach such documents to your affidavit;

6. That the computer hard drives of Captain Travis, the Fort Carson Chief of Military Justice, Criminal Law NCOIC, and Pre-

trial NCOIC, within forty-five days of the service of this Order upon the government, will be examined for electronic documentation pertaining to any request for trial forum related to appellant's court-martial. Suggested examination time parameter should include from 1 April 1998 to 10 June 1998. Suggested examination terms are "andreozzi" and "enlisted," or "andreozzi" and "forum;"

7. That the computer hard drive used by Mr. Rommel, at the Trial Defense Service during the period 1 April 1998 to 10 June 1998, within forty-five days of the service of this Order upon the government, will be examined for electronic documentation pertaining to any request for trial forum related to appellant's court-martial. Suggested examination time parameter should include from 1 April 1998 to 10 June 1998. Suggested examination terms are "andreozzi" and "enlisted," or "andreozzi" and "forum;"

8. That the electronic mail server(s) used by Mr. Rommel, Captain Travis, the Fort Carson Chief of Military Justice, Criminal Law NCOIC, and Pretrial NCOIC, within forty-five days of the service of this Order upon the government, will be examined for electronic documentation pertaining to any request for trial forum related to appellant's court-martial. Suggested examination time parameter should include from 1 April 1998 to 10 June 1998. Suggested examination terms are "andreozzi" and "enlisted," or "andreozzi" and "forum;"

9. That all Fort Carson allied papers and appellate exhibits in records of trial tried between 1 April 1998 and 1 July 1998 will be examined for documentation pertaining to any request for trial forum in appellant's case. The current Fort Carson Chief of Criminal Law, within forty-five days of the service of this Order upon the government, will provide an affidavit indicating that the examination has been completed and that the product of the examination, if any, has been provided to Government Appellate Division;

10. That the *DuBay* trial judge will supervise and provide appropriate orders to secure, at a minimum, the information sought in paragraphs 4–9 of this Order;

11. That the *DuBay* trial judge will examine any documents obtained from the examinations of Mr. Rommel's server and Mr. Rommel's hard drive, *in camera*, for relevancy as to the issue of trial forum in appellant's case. Documents that are not relevant will be destroyed. Portions of documents that are not relevant will be redacted. *See generally United States v. Humpherys*, 57 M.J. 83, 89 (2002);

12. That if the documents collected pursuant to this Order conflict with the testimony in the *DuBay* hearing of 14–15 May 2001, or conflict with each other, the *DuBay* trial judge will conduct an additional limited *DuBay* hearing;

13. That if such limited hearing is conducted, the *DuBay* trial judge will permit the presentation of witnesses and evidence, make rulings as appropriate, and enter findings of fact and conclusions of law concerning appellant's trial by a panel of officer and enlisted members, and appellant's request, if any, for such a forum;

14. That at the conclusion of such proceedings, the record, with an authenticated verbatim transcript of the hearing, will be returned to this Court for further review;

15. That the *DuBay* trial judge will provide government appellate counsel, subject to paragraph 11, with all documents obtained pursuant to this Order; *

16. That government appellate division will serve copies of all documents and affidavits obtained pursuant to this Order on appellate defense counsel, and will file all such documents and the original affidavits with this Court as appellate exhibits within sixty days of the service of this Order;

17. That after receipt of such documents and affidavits, counsel for appellant and appellee may file such other affidavits, documents, and/or pleadings as are deemed helpful to the resolution of the issue of selection

---

* No *DuBay* hearing would be necessary, for instance, if there is no conflict between the affidavits, or between the affidavits and the testimony at the previously conducted *DuBay* hearing. *See, e.g., United States v. Williams*, 53 M.J. 316, 317–18 (2000).

of trial forum with this Court within thirty days after the original documents and affidavits are filed with this Court;

**IV. FOIA and AR 25–55 request for documents and request for abeyance.**

18. That appellate defense counsel's motion for discovery is DENIED. *See United States v. Campbell,* 57 M.J. 134, 138 (2002); and,

19. That appellate defense counsel's motion for abeyance until discovery is provided is DENIED.