# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
OLMSCHEID,* GALLUP, and KIRBY
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Specialist JONATHAN R. ZAK**
**United States Army, Appellant**

ARMY 20050051

Headquarters, 1st Infantry Division
Robin Hall, Military Judge
Major William D. Smoot, Staff Judge Advocate (trial)
Lieutenant Colonel Michael E. Mulligan, Staff Judge Advocate (post-trial)

For Appellant: Major Teresa L. Raymond, JA; Matthew S. Freedus, Esq. (on brief).

For Appellee: Lieutenant Colonel Francis C. Kiley, JA; Captain Michael C. Friess, JA; Captain Andrew C. Baum, JA (on brief).

5 October 2007

---------------------------------
OPINION OF THE COURT
---------------------------------

KIRBY, Judge:

A general court-martial composed of officer and enlisted members convicted appellant, contrary to his pleas, of rape and adultery, in violation of Articles 120, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 920, and 934 [hereinafter UCMJ]. The panel sentenced appellant to a dishonorable discharge, confinement for six years, forfeiture of all pay and allowances, and reduction to Private E1. Pursuant to the staff judge advocate's (SJA) recommendation (SJAR), the convening authority approved only sixty-nine months of the sentence to confinement, but otherwise approved the adjudged sentence.[1]

---

* Senior Judge Olmscheid took final action in this case prior to leaving the court.

[1] In his addendum to the SJAR, the SJA denied legal error in the case processing, but recommended the convening authority reduce the accused's period of confinement by three months to "moot any issue regarding the post-trial processing of this case."

ZAK – ARMY 20050051

This case is before the court for review pursuant to Article 66, UCMJ.  We have considered the record of trial, appellant's assignments of error, the matters appellant personally raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), the government's reply thereto, and appellant's brief in response.  Appellant asserts, *inter alia*, that the military judge erred in excluding evidence of the "victim's prior sexual behavior towards appellant."  We agree, in part, and will grant appropriate relief in our decretal paragraph.

**FACTS**

Appellant was charged with raping (Charge I and its Specification), forcibly sodomizing (Charge II and its Specification),[2] and committing adultery (Charge III and its Specification) with his "best friend" and fellow soldier, Specialist (SPC) C, on the early morning of 8 May 2004.  The government's theory with respect to the alleged rape and forcible sodomy relied upon SPC C's inability to consent due to intoxication on the night in question and the lack of prior sexual history between appellant and SPC C.  The defense theory was that, over time, appellant and SPC C's relationship became increasingly sexual in nature, culminating in consensual sexual activity, or at least what appeared to appellant to be consensual sexual activity, on the night in question.  The defense further tried to establish that SPC C could not remember that she had, in fact, consented to sexual intercourse because she had acted while in an alcohol-induced blackout.[3]

*I. Military Rule of Evidence (Mil. R. Evid.) 412(c)(2) Hearing*

In support of the defense theory, prior to the start of trial, appellant moved to admit evidence relating to four incidents of SPC C's prior "sexual" activities with appellant and with another married noncommissioned officer.[4]  First, appellant sought to offer evidence concerning an adulterous affair SPC C had with a married noncommissioned officer in the spring of 2002.  Second, appellant wanted to testify

---

[2] Appellant was acquitted of Charge II and its Specification.

[3] The defense expert, Doctor (Dr.) Warvarovsky, supported this theory.  We find, contrary to appellant's assertion, Dr. Warvarovsky appropriately qualified as an expert in the fields of medicine and psychiatry and provided substantial underpinning to appellant's theory that SPC C had consented to sexual intercourse while in a blackout.

[4] The first three incidents were addressed in the defense's written Motion for Appropriate Relief (Appellate Exhibit IV).  The fourth incident, regarding appellant's massaging SPC C, was first introduced at the trial level during oral argument on the motion.

2

about a videotape he made in March 2004, but later erased, of SPC C who, in reenacting a scene from a movie, went into appellant's kitchen, removed her top and brassiere, and sprayed whipped cream over her breasts. When she spun around to face appellant, the whipped cream slid off. Specialist C left the kitchen to clean herself up and appellant proceeded to clean the kitchen. They then continued watching a movie and no sexual activity followed. Third, appellant wanted to testify that the videotape of the whipped cream incident also showed an intoxicated SPC C performing simulated oral sex with the groin area of an M&M figurine candy dispenser. Finally, appellant sought to offer his own testimony that two to four weeks after the whipped cream incident, he had given SPC C a full, mostly-nude, body massage.[5] Although fully clothed when the massage started, according to appellant, SPC C, who was lying face down, removed her shirt and brassiere so that he could massage her back. When appellant began to massage her legs, she also took off her pants, but left on her panties. She remained face down during the massage and got dressed when it was finished. No further sexual activity followed the massage.

In response to appellant's motion to admit evidence regarding the four instances of SPC C's alleged prior sexual activity, the government argued *inter alia* that admittance of the evidence should be denied under Mil. R. Evid. 412(a), the "rape shield" rule. The military judge determined the evidence of SPC C's alleged affair with a married noncommissioned officer two years earlier and SPC C's activity with the candy dispenser were not relevant and, therefore, inadmissible under Mil. R. Evid. 412. She determined the evidence concerning the whipped cream incident was both relevant and admissible under Mil. R. Evid. 412(b)(1)(B). The military judge disposed of appellant's testimony concerning the massage incident in the following footnote to her findings:

> I do not believe that this incident happened. I find the accused's testimony to be self-serving and incredible. If such an incident had happened, surely it would have been mentioned by the accused before now, and surely it would have been part of the original defense motion for the [Mil. R. Evid.] 412 relief. The accused admitted as much in cross[-]examination when he stated that he considers a massage given in a semi-nude state to be "sexual activity."

II.  *Government's Argument*

In his opening statement to the panel, government counsel argued:

---

[5] In testimony, SPC C denied this massage incident ever took place.

> [Appellant and SPC C] were best friends . . . .  But what
> you won't hear is that any of their experiences, from the
> time they met until the night of 7 May [2004] and the
> early morning hours of 8 May [2004], that there was any
> sexual activity between the two of them.
>
> Specialist [C]'s going to tell you; other witnesses are
> going to tell you that, yeah, they've never seen any sexual
> activity between the two of them.  None of their friends
> have, people who have observed them on several
> occasions . . . are going to get up here and say "I've never
> seen any sexual activity between the two of them."

During closing argument, government counsel similarly argued:

> Never once did [SPC C], from the day they met in 2002 to
> this very day, talk to the accused about having sex, never
> once did she consent to having sex with him, never once
> did she make a comment to him like, "I love you; I want
> you; you look good."
>
> . . . .
>
> Lots of people have seen the accused and [SPC C] together
> . . . .  Specialist Vollmer used the words, "It was a purely
> platonic relationship.  They were friends."  Nobody has
> ever seen any type of sexual activity or displays between
> the two of them, and both of them say it has never
> happened before.  They were friends.

### III.  *The Government Case*

The victim, SPC C, testified for the government at trial.  According to her testimony, she and appellant were "best friends."  On 7 May 2004, appellant met her at her barracks and drove her to his on post quarters for "taco soup night."  She believed they were going to have dinner and watch movies with friends.  Prior to meeting appellant, SPC C had two or three rum and Cokes.  While waiting for their other friends to arrive, SPC C had another rum and Coke.  Once the others arrived, they started drinking a mixture of beer and Amaretto and ate dinner.  Specialist C estimated that she consumed a total of seven to eight drinks of rum and Coke, the beer and Amaretto mixture, and straight Amaretto shots over the course of the evening.  She testified that she became drunk very quickly.  She explained that she "went from a buzz, so to speak, to being obliterated within an hour [from arriving at

 appellant's quarters]. . . . I just became extremely nauseous, unable to do anything, . . . walking into doorways, couldn't dial the phone, couldn't do anything."

Sometime during the evening, SPC C tried to call a male acquaintance to set up a date for later that evening. She could not see the numbers on her cellular phone, however, so appellant dialed the number for her.[6] During the telephone conversation, she realized that she was already extremely drunk. The party moved into the living room to watch movies and appellant made fun of her for tripping over a trash can, saying, "You drunk, you're such a lush." Due to limited seating, she sat on appellant's knee and had to put her arm around him to hold herself up.

Later, because she was too intoxicated to walk home and appellant was too intoxicated to drive her, she asked appellant if she could sleep in his guest room. Once in the room, she took her shoes off, got into bed, and fell asleep. The next thing she remembered is that she thought she was dreaming about something entering her vagina and seemed to be coming in and out of consciousness. When she felt a sharp pain in her rectum, she screamed, "Ouch, get off of me." She tried to get up, but because appellant's hands pinned her wrists down, she could not. She was then rolled onto her back where she recognized appellant as her attacker. Appellant then penetrated her vaginally again. When he penetrated her anally a second time, she again screamed, "Ouch stop it. Get off of me." While appellant tried to roll her onto her stomach, she rolled out from underneath him and pulled her pants up. Appellant was completely nude.

Specialist C grabbed her belongings, left the house, and walked toward the barracks. Outside the shoppette, she ran into Staff Sergeant (SSG) Brown. When he asked if she was alright, she responded "I don't understand what's going on. I don't know why he did this. I don't know what's going on." Staff Sergeant Brown helped her try to call her roommate and walked her back to her barracks. On the way to the barracks, she stumbled and fell backwards. Upon their arrival, SSG Brown helped her to her room and told the CQ to call the first sergeant. The military police (MPs) came to interview her.

On cross-examination, SPC C admitted to having experienced, since the age of seventeen, at least seven drug-induced blackout periods in which she could not remember her actions. She also admitted to enrolling in a drug treatment program shortly before deploying, to drinking heavily when she returned from the deployment, and to the aforementioned whipped-cream incident,[7] which occurred shortly after appellant told her that his wife would not be joining him in Germany.

---

[6] In testimony, appellant denied this occurred.

[7] Her testimony concerning this incident differs from appellant's testimony in that according to her, she quickly covered her breasts with her arm when she realized the whipped cream was not sticking to her breasts.

She testified that she thought of appellant as a brother and went to his quarters to talk, watch movies, eat meals, and sometimes drink alcohol three or four times a week.

Through a stipulation of expected testimony, Ms. Kostich, one of the other individuals at the party the night in question, testified that she and SPC C became very intoxicated at the party and were both loud and obnoxious. She had never seen appellant and SPC C engage in any type of sexual activity.

Ms. Kostich's husband, PFC Kostich, was also at the party and testified that, because he was the designated driver, he did not drink any alcohol that evening. It appeared to him that his wife, SPC C, and appellant seemed intoxicated because they were emotional, loud, and obnoxious. He never saw any sexual activity between appellant and SPC C.

Staff Sergeant Brown testified that he saw SPC C crying outside the shoppette at 0130 hours. He asked her if she was alright, and she said "no." He could tell she had been drinking, but could not judge her level of intoxication. Because SPC C said that she wanted to call her roommate and go home, SSG Brown took her inside the shoppette to use the store's phone to call her roommate. Either because of her level of intoxication or because it was a German phone, SPC C could not dial the numbers, so the clerk dialed them for her. When she told SSG Brown that her roommate was not home, he walked her back to the barracks.

Along the way she slipped and fell in the mud. During the walk, SPC C told SSG Brown that an unnamed person from their battalion would not let her go or leave the room and had sex with her. Once SSG Brown got her back to her room, he told the CQ to call the first sergeant. He then told the first sergeant that, based upon his conversation with SPC C, he thought she might have been sexually assaulted. Pursuant to the first sergeant's direction, SSG Brown called the MPs. Staff Sergeant Brown never witnessed any sexual activity between appellant and SPC C.

Finally, SPC C's roommate, SPC Vollmer, testified that when she returned to the room, SPC C was upset and told SPC Vollmer that appellant raped her. Specialist C seemed a little disoriented, but it was hard for SPC Vollmer to determine whether the disorientation was caused by intoxication or the force of the tears. According to SPC Vollmer, SPC C and appellant acted like they had a "purely platonic" friendship. She had never seen any sexual activity between them.

IV. *The Defense Case*

The defense began its case by bringing in appellant's first sergeant and company commander who testified that appellant was a great soldier with a reputation for peacefulness and respect toward women. Then appellant testified on his own behalf.

According to appellant, he met SPC C in Germany. When they deployed to Iraq for twelve months, they spent a lot of time together and became very close. Upon their return to Germany, they continued to spend a lot of time together. He soon learned that his wife had decided to extend her contract with the Army Corps of Engineers and would not be coming back to Germany. He confided this to SPC C who tried to comfort him. After describing the aforementioned whipped cream incident to the panel, he then explained his version of what transpired on the evening of the alleged crimes.

According to appellant, he invited SPC C and some friends over for dinner. During the course of the evening, he could tell that SPC C was intoxicated because she became loud and obnoxious, and did "playful things — like run around and act silly." After everyone else left, he saw SPC C falling asleep in her chair, so he asked her if she wanted to go home. She did not want to walk home, and accepted his invitation to sleep in his guest room. He got her some pajama bottoms and she went upstairs to go to sleep. After he straightened things up from the party, he went upstairs to check on SPC C. Because she had been acting more flirtatious than usual, he decided to see how far he could go sexually with her. He turned on the lights and shook her shoulder. When she opened her eyes and smiled, he began to rub her breasts. She kept smiling and "squirming," so he fondled her genitalia. She continued smiling, rubbed his arm and tugged on his shirt and pajama bottoms, so he took off his shirt. She kept tugging on his pants, so he took off his pants and continued rubbing her genitalia. She tugged at her pants, so he helped her take them off.

He began having vaginal sex with her. According to appellant, she was moaning, looking at him, and smiling. She rolled over onto her hands and knees and they continued to have vaginal intercourse. His penis slipped out of her vagina and hit something hard, which hurt him and seemed to hurt SPC C, as she grimaced. He resumed having vaginal intercourse with SPC C, but before ejaculating realized he did not have on a condom. He left the room briefly to get a condom, and when he returned, SPC C was standing up, putting on her clothes, and crying. He reached for her and she pushed his hand away saying "Zak, no." She then asked for a ride home, but he told her that he was too drunk to drive, and she left. Appellant thought SPC C consented to vaginal sexual intercourse, and they had not, to his knowledge, engaged in anal sexual intercourse.

On cross-examination, appellant admitted that SPC C probably did seem intoxicated and that she may have had seven to eight alcoholic drinks. He also admitted that SPC C had never asked him to have sexual intercourse with her or told him she was sexually attracted to him. Also, she did not tell him that she was sexually attracted to him or that she wanted to have sexual intercourse with him that night. She was asleep when he went upstairs and entered the guest room. The following colloquy ensued between appellant and government counsel:

> Q.      So you initiated sex with a drunk soldier who had never told you that she was sexually attracted to you, and she'd never told you that she wanted to have sex with you, correct?
>
> A.      Yes, sir.
>
> Q.      Okay.  And during this sexual encounter, the first words you remember her saying to you were, "no," is that correct?
>
> A.      No, it was "Zak, no," sir.

The defense then called Special Agent Ferrer, who interviewed SPC C early on 8 May 2004.  He testified that although SPC C smelled like alcohol, she did not appear to be intoxicated.  The defense also called Major (MAJ) Bell, who conducted the rape kit examination of SPC C.  Major Bell found no signs of ejaculation, blunt force or trauma on the vagina or rectal area.  Major Bell did find vaginal secretions which he said were normal when sexually stimulated.

Finally, the defense called Doctor (Dr.) Warvarovsky.  He testified as an expert witness in the fields of medicine and psychiatry.  His testimony focused on how alcohol could affect the transfer of sensory and short-term memory to the long-term memory.  He also testified that alcohol consumption and a history of blackouts increases the likelihood of future blackouts.   According to him, a "blackout" is a period of time where an individual is receiving sensual perceptions, or short-term memory, but these either do not get processed into the long-term memory, or only get partially processed into the long-term memory.  He differentiated a blackout period from a period where a person is completely unconscious, or passed out.  As Dr. Warvarovsky explained:

> There are people that can blackout for like two to . . . five hours and remember nothing, but during that time period, they appear normal, or you really can't tell they are intoxicated.  They can do things, they can drive their car, go shopping, spend money, engage in activities that they can't remember, and then also engage in activities that they wish they didn't have to remember, so if-if-they don't remember it as so.

After interviewing both SPC C and appellant, reviewing their medical records, and listening to their testimony, Dr. Warvarovsky was "very confident" it was "highly probable" that SPC C had a blackout on the night in question.

The panel found appellant guilty of rape and adultery.

**LAW**

Military Rule of Evidence 412 provides, in pertinent part with underlined emphasis added:

> (a) *Evidence generally inadmissible.* The following evidence is not admissible in any proceeding involving alleged sexual misconduct except as provided in subdivisions (b) and (c):
>
> (1) Evidence offered to prove that any alleged victim engaged in other sexual behavior.
>
> (2) Evidence offered to prove any alleged victim's sexual predisposition.
>
> (b) *Exceptions.*
>
> (1) In a proceeding, the following evidence is admissible, if otherwise admissible under these rules:
>
> . . . .
>
> (B) evidence of specific instances of sexual behavior by the alleged victim with respect to the person accused of the sexual misconduct offered by the accused to prove consent or by the prosecution; and
>
> (C) evidence the exclusion of which would violate the [C]onstitutional rights of the accused.
>
> (c) *Procedure to determine admissibility.*
>
> . . . .
>
> (2) Before admitting evidence under this rule, the military judge must conduct a hearing, which shall be closed. At this hearing, the parties may call witnesses, including the alleged victim, and offer relevant evidence. The victim must be afforded a reasonable opportunity to attend and be heard. In a case before a court-martial composed of a military judge and members, the military judge shall

> conduct the hearing outside the presence of the members pursuant to Article 39(a)[, UCMJ]. The motion, related papers, and the record of the hearing must be sealed and remain under seal unless the court orders otherwise.
>
> (3) <u>If the military judge determines on the basis of the hearing described in paragraph (2) of this subdivision that the evidence that the accused seeks to offer is relevant and that the probative value of such evidence outweighs the danger of unfair prejudice, such evidence shall be admissible in the trial</u> to the extent an order made by the military judge specifies evidence that may be offered and areas with respect to which the alleged victim may be examined or cross-examined.
>
> . . . .
>
> (d) For purposes of this rule, the term "sexual behavior" includes any sexual behavior not encompassed by the alleged offense. The term "sexual predisposition" refers to an alleged victim's mode of dress, speech, or lifestyle that does not directly refer to sexual activities or thoughts but that may have a sexual connotation for the factfinder.
>
> (e) A "nonconsensual sexual offense" is a sexual offense in which consent by the victim is an affirmative defense or in which the lack of consent is an element of the offense. This term includes rape, forcible sodomy, assault with intent to commit rape or forcible sodomy, indecent assault, and attempts to commit such offenses.

As our superior court has noted, "[Mil. R. Evid.] 412 was intended to protect victims of sexual offenses from the degrading and embarrassing disclosure of intimate details of their private lives while preserving the [C]onstitutional rights of the accused to present a defense." *United States v. Banker*, 60 M.J. 216, 219 (C.A.A.F. 2004) (citing *United States v. Sanchez*, 44 M.J. 174, 178 (C.A.A.F. 1996); [*Manual for Courts-Martial* (*MCM*)], Drafter's Analysis at A22-36). A judge's decision to exclude evidence under Mil. R. Evid. 412 is reviewed under an abuse of discretion standard. *Id*. at 223. If we determine that the military judge excluded Constitutionally required evidence, we may not affirm a finding of guilty unless we are convinced that the error was harmless beyond a reasonable doubt. *United States v. Andreozzi*, 60 M.J. 727, 738 (Army Ct. Crim. 2004), *pet. denied*, 62 M.J 309 (C.A.A.F. 2005).

As Mil. R. Evid. 412 is a rule of exclusion, at a hearing held pursuant to Mil. R. Evid. 412(c)(2), the party seeking to admit such evidence has the burden of establishing under which exception of the rule the evidence is admissible. *Banker*, 60 M.J. at 222; *Andreozzi*, 60 M.J. at 739. In analyzing admissibility, the military judge must first determine whether the evidence is relevant under Mil. R. Evid. 401, and then apply the balancing test under Mil. R. Evid. 412(c)(3). *Banker*, 60 M.J. at 222; *Andreozzi*, 60 M.J. at 739.

The military judge must keep in mind that:

> Although this two-part relevance-balance analysis is applicable to all three of the enumerated exceptions, evidence offered under the [C]onstitutionally required exception is subject to distinct analysis. Under [Mil. R. Evid.] 412(b)(1)(C), the accused has the right to present evidence that is relevant, material, and favorable to his defense. While the relevancy portion of this test is the same as that employed for the other two exceptions of the rule, if the evidence is relevant, the military judge must then decide if the evidence offered under the [C]onstitutionally required exception is material and favorable to the accused's defense, and thus whether it is necessary.
>
> In determining whether evidence is material, the military judge looks at the importance of the issue for which the evidence was offered in relation to the other issues in this case; the extent to which this issue is in dispute; and the nature of the other evidence in the case pertaining to this issue.
>
> After determining whether the evidence offered by the accused is relevant and material, the judge employs the [Mil. R. Evid.] 412 balancing test in determining whether the evidence is favorable to the accused's defense. While the term favorable may not lend itself to a specific definition, we believe that based on Supreme Court precedent and our own Court's rulings in this area, the term is synonymous with vital.

*Banker*, 60 M.J. at 222 (internal quotation marks and citations omitted).

Finally, we must emphasize our superior court's admonition: "In applying Mil. R. Evid. 412, the judge is *not* asked to determine if the proferred evidence is *true*; *it is for the members to weigh the evidence and determine its veracity.*" *Id.* at

11

224 (emphasis added). As the Tenth Circuit Court of Appeals stated in analyzing Federal Rule of Evidence 412:

> If a rule were to say that a defense may not offer evidence in defense unless the Judge believes it, that rule would violate the right to the jury trial. *This is what Rule 412 would tend to do if it is read to allow the Judge to bar reasonable defense evidence that the Judge personally concludes is not credible.*"

*United States v. Platero*, F.3d 806, 813 (10th Cir. 1995) (quoting 1 Stephen A. Saltzburg & Michael M. Martin, *Federal Rules of Evidence Manual: A Complete Guide to the Federal Rules of Evidence* 396 (5th ed. 1990) (emphasis added)), *cert. denied*, 514 U.S. 1041 (1995).

## ANALYSIS

We agree with the military judge that SPC C's affair with a married man two years prior to the evening in question and her activity with the candy dispenser were not relevant to the charges in this case and were, therefore, not admissible under Mil. R. Evid. 412. We disagree, however, with the military judge's exclusion of evidence of appellant's mostly-nude massage of SPC C. The footnote to the military judge's findings referencing the massage clearly reveals that she did not evaluate the evidence under the two-prong analysis required under Mil. R. Evid. 412 and the *Banker* and *Andreozzi* decisions, discussed above. Rather, she excluded the evidence because she did not "believe that this incident happened" and found appellant's "testimony to be self-serving and incredible." As highlighted above, the military judge's ruling on the veracity of the evidence usurped the role of the panel members, was clear error, and, as a result, an abuse of discretion. *Banker*, 60 M.J. at 224; *Patero*, 72 F.3d at 812. At a Mil. R. Evid. 412(c)(2) hearing, the military judge is to determine whether the evidence is *relevant* and falls into one of the listed exceptions — *not* whether the evidence is *true*. *Banker*, 60 M.J. at 224.

Appellant's massage of SPC C, who, according to him, voluntarily stripped down to her panties while they were alone in his house, within a month or two of the alleged forcible sexual activity, was clearly relevant and admissible both as "evidence of specific behavior by the alleged victim with respect to the person accused of sexual misconduct offered by the accused to prove consent . . . [,]" under Mil. R. Evid. 412(b)(1)(B), and as "evidence the exclusion of which would violate the [C]onstitutional rights of the accused[,]" under Mil. R. Evid. 412(b)(1)(C).

Furthermore, knowing the judge had excluded evidence of the mostly-nude massage, the government nonetheless relied heavily upon the lack of evidence of prior sexual activity between appellant and SPC C in its opening statement and

closing argument and made sure that each of its witnesses testified to that effect at trial. Appellant certainly had a right to testify in an attempt to fully rebut this assertion. Moreover, appellant's defense of mistake of fact as to consent certainly is much less credible absent any evidence that SPC C felt comfortable stripping down to her panties and allowing appellant to massage her mostly-nude body. The military judge's exclusion of this evidence, therefore, violated appellant's Constitutional right to present a defense.

This does not end our analysis however; we must now determine whether the error was harmless beyond a reasonable doubt. *Andreozzi*, 60 M.J. at 738. To do so, we must evaluate a number of factors including the overall strength of the government's case and the importance of the evidence to the defense's case. *Id.* at 741.

The government's case was not particularly strong. Specialist C admitted that she and appellant were "best friends" who spent a lot of time alone together. Although several witnesses from the party testified that SPC C consumed alcohol that evening, they could not testify as to her level of intoxication, but only that she was loud and obnoxious. The government presented very little independent evidence, other than from SPC C's own testimony, that she was intoxicated to the point where she could not function, or at least appear to be functioning. Even according to her own testimony, she had the wherewithal to interact with people, ask appellant if she could stay in his guestroom, and put herself to bed. When she awoke, she was able to stand, dress herself, ask appellant for a ride home, and walk toward the barracks. She was also able to interact with SSG Brown, her roommate, and the MPs after the incident. Although these witnesses testified that she smelled of alcohol and was clearly upset, they all stated they could not tell her level of intoxication. Nobody checked her blood alcohol content. Furthermore, the rape kit did not reveal any evidence of physical trauma or appellant's DNA.

The defense, on the other hand, provided very strong scientific evidence that, given her history of drug-induced blackouts, it was "highly probable" SPC C was in a blackout state where she *appeared* to be consenting to sexual activity. The evidence the government admitted at trial showed only that SPC C and appellant were very good friends who spent a lot of time together, but had never engaged in any "sexual activity." The only evidence presented to contradict the notion that their relationship was "purely platonic" prior to the night in question, was the incident where SPC C took off her shirt and brassiere and sprayed her breasts with whipped cream. By itself, this incident may appear to be an isolated incident of mere immaturity as opposed to sexual behavior, which would not support a reasonable belief that SPC C would later consent to sexual activity with appellant. If one adds, however, appellant's testimony concerning the subsequent, mostly-nude massage, then the panel may have believed that this was a friendship with escalating

sexually charged events. As a result, the panel may have accepted as reasonable appellant's belief that SPC C consented to sexual activity on the night in question.

As a result, we cannot conclude beyond a reasonable doubt that the military judge's exclusion of this evidence was harmless and did not contribute to the finding of guilty to rape. We, therefore, cannot affirm the finding of guilty to rape. We find, however, sufficient evidence to support a finding of guilty to the charge and specification of adultery.

## CONCLUSION

The findings of guilty to Charge I and its Specification (rape), and the sentence are set aside. The findings of guilty to Charge III and its Specification (adultery) are affirmed. The same or different convening authority may order a rehearing on Charge I and its Specification and the sentence. If the convening authority determines that a rehearing on Charge I and its Specification is impractical, he may dismiss Charge I and its Specification and order a rehearing on the sentence only.

Senior Judge OLMSCHEID and Judge GALLUP concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court

14